Hassan A. Zavareei (SBN 181547)
Andrea R. Gold*
Katherine M. Aizpuru*
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
kaizpuru@tzlegal.com

*Counsel for Plaintiff and the Putative Class*

*Pro hac vice applications to be submitted

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FRANCIS LOPEZ, d/b/a FMS Accounting,** *on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>**BANK OF AMERICA, N.A.**<br><br>Defendant. | No. 3:20-cv-04172<br><br>**CLASS ACTION COMPLAINT**<br><br>Declaratory Relief; Unjust Enrichment; Money Had and Received; Breach of Contract—Third Party Beneficiary; Unfair Competition Law |

Plaintiff **FRANCIS LOPEZ**, through counsel, brings this Class Action Complaint and Demand for Jury Trial against Defendant **BANK OF AMERICA, N.A.**, alleging claims for declaratory relief, unjust enrichment, money had and received, breach of contract, and California's Unfair Competition Law. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and as to all other matters upon information and belief and the investigation of counsel.

///

///

///

# NATURE OF THE ACTION

1. In March of 2020, as the SARS-CoV-2 virus—the virus that causes the COVID-19 disease (also called "coronavirus")—spread across the United States, Congress passed and President Donald J. Trump signed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), a $2 trillion coronavirus response bill intended to speed relief across the American economy. As businesses shut down in compliance with state and local shelter-in-place orders—or simply in response to a severe decline in demand for services—millions of Americans lost their jobs and the stock market crashed. The CARES Act was intended to inject money into the economy and help keep businesses and individuals afloat during an unprecedented economic upheaval.

2. Along with other provisions, the CARES Act created the Paycheck Protection Program ("PPP") to funnel forgivable loans to small businesses. The CARES Act initially authorized up to $349 billion in forgivable loans; that money quickly ran out, and Congress later authorized an additional $310 billion to the program.

3. Small businesses were invited to apply for PPP funds starting April 3, 2020. Applicants could seek PPP loan funding through certain pre-approved Small Business Administration ("SBA") lenders or through any federally insured depository institution, federally insured credit union, or Farm Credit System institution that chose to participate.

4. Lenders were compensated for their participation in the program through generous origination fees, paid by the government, that were tied to the amount of each loan. Lenders are eligible to receive (a) 5% for loans up to and including $350,000; (b) 3% for loans of more than $350,000 and less than $2,000,000; and (c) 1% for loans of at least $2,000,000. To receive these substantial origination fees, the lenders took on no risk (because the loan funds were provided by the government) and did little work. Instead, the lenders were paid for funneling money from the SBA to the small business applicants. Lenders were, however, required to certify under penalty of perjury that they were in compliance, and would remain in compliance, with PPP regulations.

5. The amount of money offered to small business applicants was based on applicants' historical payroll information with specific limitations. But because the purpose of the program was to make money available quickly, lending institutions were not required to independently verify applicants'

representations. Instead, small businesses seeking PPP funding were required to make specific attestations and certifications under penalty of serious civil and criminal penalties, including imprisonment and hefty fines.

6. Congress understood that in order to be able to make timely, truthful, and accurate representations in their PPP applications, many small businesses applying for PPP funding would rely on the assistance and expertise of professionals: accountants, bookkeepers, tax preparers, financial advisors, attorneys, and other such agents (collectively, "Agents").

7. To incentivize these Agents to assist small businesses with their PPP applications, Congress provided that Agents who assisted small business owners would be compensated through a fee of up to (a) 1% for loans of up to $350,000 (or up to $3,500 for loans in this tier); (b) 0.50% for loans of more than $350,000 and less than $2 million (or up to $9,999 for loans in this tier); or (c) 0.25% for loans of at least $2 million ("Agent Fees"). *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020) ("PPP Regulations").

8. The PPP Regulations expressly require that Agent Fees be paid by the lending institution out of the origination fees the lender would receive from the SBA, and prohibit Agents from collecting fees from applicants or taking fees from the PPP loans.

9. Defendant is one of the largest banks in the United States and was the first major financial institution to begin accepting PPP applications. As of May 2020, Defendant had received approval for 265,000 PPP applications with an average funding amount of $92,800 and totaling $24.9 billion.[1] Defendant profited handsomely from its involvement in the PPP. Assuming the most conservative estimate, Defendant received or is eligible to receive at least $240 million in origination fees from the SBA—and probably received more than that. But having taken in this princely sum, Defendant violated the PPP requirements regarding Agent Fees and failed to pay Agent Fees that were due under the CARES Act.

---

[1] *See* Bank of America Newsroom, *Bank of America Receives Approval for 265,500 SBA Paycheck Protection Program Loans to Date for Small Businesses* (May 4, 2020), https://newsroom.bankofamerica.com/press-releases/small-business/bank-america-receives-approval-SBA-paycheck-protection-program-loans (last accessed June 24, 2020); *see also* Bank of America Paycheck Protection Program (May 4, 2020), https://newsroom.bankofamerica.com/system/files/BAC_Paycheck_Protection_Program_Loans_for_Small_Businesses.pdf (last accessed June 24, 2020).

10. Plaintiff Francis Lopez is a bookkeeper who assisted his small business client with preparing and submitting an application for a PPP loan through Defendant. The application was approved, securing a total of $70,243 in funding for Mr. Lopez's client. Under the PPP rules, Defendant received an origination fee of $3,512.15, and Plaintiff was entitled to an Agent Fee of $702.43 to be paid from Defendant's origination fee.

11. Yet despite clear direction from the SBA that the Agent fees "*will be paid by the lender out of the fees the lender receives from the SBA*," and despite certifying under penalty of perjury that it was in compliance and would remain in compliance with PPP regulations, Defendant has not remitted any fees to Plaintiff.

12. Plaintiff is not alone in his predicament. Defendant has enacted a companywide policy to deny Agents the Agent Fees to which they are entitled. Defendant instead states on its website that, "[i]n the absence of a pre-loan approval written agreement between the agent and Bank of America, *Bank of America does not pay fees or other compensation to agents who represent or assist borrowers through the Paycheck Protection Program.*"[2] Defendant's scheme, which directly contradicts the mandate of the PPP Regulations, excluded Agents like Plaintiff from access to SBA funding.

13. Plaintiff, a sole proprietor, is also suffering from the economic downturn due to the coronavirus pandemic. He is entitled to the Agent Fee he earned by helping another business apply for a forgivable loan. Plaintiff and other Agents entitled to receive Agent Fees from Defendant have no other recourse to collect their compensation because the PPP regulations assign the responsibility for paying them to lenders alone, and prohibit them from collecting compensation from their clients.

14. Ignoring this clear mandate, Defendant has refused to pay Plaintiff and other Agents—depriving them of much-needed funds during a time of severe economic hardship, even as Defendant enjoys a windfall.

15. Plaintiff thus brings this Class Action Complaint to vindicate his rights and those of

---

[2] Bank of America, CARES Act Paycheck Protection Program Frequently Asked Questions https://about.bankofamerica.com/promo/assistance/faqs/small-business-paycheck-protection-program (last accessed June 24, 2020).

4

CLASS ACTION COMPLAINT

other Agents similarly situated, and to recover the Agent Fees to which they are entitled.

## PARTIES

16. Plaintiff Francis Lopez is a resident and citizen of California. He is the sole proprietor of FMS Accounting, a client accounting services practice.

17. Defendant Bank of America, N.A. is a national bank with headquarters in North Carolina, making it a citizen of North Carolina.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class is a citizen of a different state than Defendant; (b) the claims of the proposed Class Members exceed $5,000,000 in the aggregate; and (c) none of the exceptions under that subsection apply.

19. This Court has personal jurisdiction over Defendant because Defendant conducts business in this District as described herein.

20. Venue is proper in this District because a substantial part of the events, acts, or omissions giving rise to the claim occurred in this District.

21. This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the PPP Regulations.

## FACTUAL ALLEGATIONS

22. Beginning in December 2019, reports began to surface about a novel coronavirus spreading rapidly through Wuhan, China. By March 1, 2020, researchers concluded that over 9,000 people in the United States had already been infected and that the virus had been spreading, undetected, within the United States for six weeks.[3] The World Health Organization declared the COVID-19

---

[3] *See* Cedars-Sinai, Study Estimates COVID-19 May Have Infected Over 9,000 in U.S. (Mar. 9, 2020), https://www.cedars-sinai.org/newsroom/study-estimates-covid-19-may-have-infected-over-9000-in-us/(last accessed June 24, 2020); Sheri Fink & Mike Baker, Coronavirus May Have Spread in U.S. for Weeks, Gene Sequencing Suggests, *The New York Times* (Mar. 1, 2020), https://www.nytimes.com/2020/03/01/health/coronavirus-washington-spread.html?action=click&module=Top%20Stories&pgtype=Homepage (last accessed June 24, 2020).

outbreak a pandemic on March 11. On March 13, 2020, President Donald Trump declared that the pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia." California Governor Gavin Newsom issued a stay-at-home order on March 19, ordering the closure of most public spaces and nonessential businesses. California's order was followed by Illinois on March 21, New York on March 22, and dozens of other states and the District of Columbia in the days and weeks that followed.

23. As the pandemic spread, millions of people in the United States lost their jobs as state and local stay-at-home orders forced businesses to close. Even in states where businesses were allowed to remain open, multiple sectors experienced economic devastation as consumers stayed home to try to counteract the spread of the deadly virus. Demand for goods and services plummeted.

24. On March 25, 2020, in response to overwhelming pleas for assistance from state and local governments, businesses, and individuals, the United States Senate passed the CARES Act. The House of Representatives approved the bill the following day, and President Trump signed it into law on March 27, 2020. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (2020). The $2 trillion stimulus bill is the largest stimulus bill in American history.

25. One of the cornerstones of the CARES Act is the $659 billion loan program for small businesses, the Paycheck Protection Program. *See id.* § 1102, 134 Stat. at 286 (codified at 15 U.S.C. § 636(a) (2020)). In creating the PPP, the federal government recognized that "many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the virus." PPP Regulations at 20811. The intent of the PPP is to "provide relief to America's small business expeditiously." *Id.*

26. PPP loans provided small businesses with eight weeks of cash-flow assistance based on historical payroll information. The loans are forgivable up to the full principal amount of the loan and any accrued interest if the borrower uses the loan proceeds for certain purposes and uses at least 75% of the funds for payroll costs. *Id.* at 20813-14. This restriction was implemented "to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven." *Id.* at 20814. Amounts that are not forgiven will accrue interest at a rate of 1% with a maturity of two

years. *Id.* at 20813.

27. Unlike some other financial assistance provided in the CARES Act, the PPP provided that private lending institutions, rather than government agencies, were to accept loan applications and distribute funds. Lenders approved to make PPP funds included certain SBA-approved lenders, any federally insured depository institution or any federally insured credit union, any Farm Credit System Institution, and certain other financing providers that met specific requirements. *Id.* at 20815.

28. To compensate lenders for participating in the program, the PPP Regulations provide that SBA will pay lenders substantial origination fees for processing PPP loans: (a) 5% for loans up to and including $350,000 (or up to $17,500 for loans in this tier); (b) 3% for loans of more than $350,000 and less than $2,000,000 (or up to $59,999 for loans in this tier); and (c) 1% for loans of at least $2,000,000. *Id.* at 20816.

29. In order to expedite the provision of PPP loan funds to businesses in need, the PPP Regulations provide that lenders may rely on borrower certifications and attestations in order to approve a loan application, rather than independently verifying the information provided in the application. *Id.* at 20815-16. The CARES Act specifically provides that lending institutions will not be subject to enforcement actions or penalties if the lender has received a borrower attestation. *Id.* at 20816.

30. But because the program intentionally did not include any process for verifying borrower representations, the penalties for providing false information are severe. Knowingly making a false statement to obtain a guaranteed loan from SBA is punishable by imprisonment and fines. *Id.* at 20814. It was therefore incumbent upon small business applicants to provide truthful and accurate information in their applications.

31. PPP applications were to be processed and funded on a "first-come, first-served" basis. Because the PPP funds were limited, submitting an accurate application as quickly as possible, before the appropriation was depleted, was critical.

32. Because many small businesses applying for PPP funding would require the assistance of professional accountants, bookkeepers, tax preparers, financial advisors, attorneys, and other agents in order to provide timely, truthful, and accurate representations, Congress recognized that these

7

"agents" would need to be compensated for their work as well. *See* 15 U.S.C. § 636(a)(36)(P)(ii) ("An agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator.").

33. The SBA, in turn, determined that these reasonable fees were required to be paid by the lender, in specifically delineated amounts. The PPP Regulations include express provisions for the compensation of Agents:

> **c. Who pays the fee to an agent who assists a borrower?**
>
> Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:
>
> i. One (1) percent for loans of not more than $350,000;
>
> ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and
>
> iii. 0.25 percent for loans of at least $2 million.
>
> The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application requirements and the fees that lenders receive for making PPP loans.

*Id.* at 20816.

34. The SBA also issued a fact sheet that makes clear that Agent Fees must be paid by the lender: "Agent fees will be paid out of lender fees. The lender will pay the agent. Agents may not collect any fees from the applicant."[4]

35. Congress and the SBA did not create a particular process or requirement that lenders or Agents were required to follow in order for the Agent to receive its portion of the fee. Creating a uniform process (and requiring all lenders to comply with additional regulations) would have slowed down implementation of the program—when its core purpose was the speedy distribution of funds to businesses—and could have incentivized lenders to prioritize applicants that did not use Agents so that lenders did not have to share their origination fees.

---

[4] Paycheck Protection Program (PPP) Information Sheet for Lenders (Mar. 31, 2020), https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed June 24, 2020).

36. Instead, the SBA left to the discretion of the lender how best to process applications speedily while complying with the regulations requiring them to compensate Agents for the latter's critical role in the program.

37. But, prior to becoming an approved PPP lender, lenders were required to fill out and sign the "CARES Act Section 1102 Lender Agreement" for each loan.[5] That agreement requires the lender to certify under penalty of perjury that it is "in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program, and PPP Loan Program Requirements."

38. Defendant has breached its commitment to remain in compliance with PPP Regulations. Defendant has not paid the fees of Agents for their assistance in providing accurate and truthful information on borrowers' applications. Instead, it is retaining *all* of the origination fees received from SBA for itself despite its obligation to distribute some portion of those fees to Agents. These funds are a windfall to Defendant—making it the recipient of substantial government aid that it does not need and does not deserve.

39. This is a company-wide policy to which Defendant openly admits. On its website, Defendant states that "[i]n the absence of a pre-loan approval written agreement between the agent and Bank of America, Bank of America does not pay fees or other compensation to agents who represent or assist borrowers through the Paycheck Protection Program." But nothing in the CARES Act or the PPP Regulations requires that such a pre-loan approval written agreement exist—or permits lenders to impose such a requirement.

40. Consistent with its policy, which directly contradicts the PPP Regulations and other SBA guidance, Defendant did not implement any process for identifying the Agents who assisted borrowers in obtaining PPP loans from Defendant. By failing even to ask borrowers whether they utilized the assistance of an Agent, Defendant demonstrated that it did not want to obtain any records of Agent involvement—likely hoping that the absence of such records would relieve it of the obligation to pay Agents their mandatory fees.

---

[5] The agreement is available for download at https://www.sba.gov/document/sba-form--cares-act-section-1102-lender-agreement.

41. Defendant's policy of refusing to pay Agent Fees that are due, that lenders are required to pay, and that *only* lenders are authorized to pay, deprives Agents of their ability to receive the payment they are owed.

42. Defendant processed over 265,000 PPP loan applications, securing over $24 billion in funding for applicants. Assuming a conservative 1% fee, Defendant likely has or will receive at least $240 million in origination fees from which it was required to pay Agents the fees that they earned.

43. But rather than comply with the PPP regulations and pay the Agents their fees, Defendant decided to keep that money for itself.

## NAMED PLAINTIFF'S FACTS

44. Francis Lopez, a sole proprietor, opened his bookkeeping firm, FMS Accounting, in late 2019. His fictitious business name statement is registered in San Mateo County, and he has a business license through Daly City, CA. Mr. Lopez performs bookkeeping services on behalf of several clients, all of whom are small businesses located in the San Francisco area.

45. On Friday, April 3, 2020, one of Mr. Lopez's clients asked Mr. Lopez to investigate the PPP and other assistance programs offered by the government in response to the coronavirus pandemic. Before the pandemic, the client sold auto parts and performed installations of home entertainment systems. But the client's business was deemed nonessential, and it was forced to close its doors due to the California stay-at-home order—events that eventually led the client to close down its auto parts business altogether. The client, who has a business account with Bank of America, received an email from Bank of America stating that the client could apply for a PPP loan through Bank of America.

46. Mr. Lopez spent several hours researching the CARES Act and the PPP. He reviewed fact sheets and information created by financial advisors and tax attorneys and watched webinars about PPP requirements. He also reviewed the borrower application created by the SBA.

47. On Tuesday, April 7, 2020, Mr. Lopez helped his client apply for a loan of $70,243. Mr. Lopez traveled to the client's office to meet with the client and help him apply for a PPP loan. Mr. Lopez printed out the client's payroll information from the payroll provider and reviewed the numbers to calculate the correct amount to apply for. Together, Mr. Lopez and the client filled out the Bank of

America PPP loan application based on the information that Mr. Lopez had gathered, reviewed, and calculated.

48. Although the SBA offered an application form, Bank of America required applicants to submit PPP applications through Bank of America's online portal.

49. The Bank of America PPP application did not include a field for the applicant to indicate whether an Agent had assisted with the application.

50. After about two weeks, the client received PPP funding of $70,243. Based on the size of the loan and the PPP Regulations, Bank of America was entitled to receive an origination fee of $3,512.15.

51. Also based on the PPP Regulations, Mr. Lopez was entitled to an Agent Fee of $702.43 to be paid from Defendant's origination fee. But to date, Mr. Lopez has not received any compensation for his substantial assistance with his client's PPP loan application—assistance that inured to the benefit of Defendant, who has received a windfall in origination fees from the SBA.

52. Instead, Bank of America's policy is to deny Agents the fees to which they are entitled.

53. Mr. Lopez has suffered financial harm as a result of Defendant's unlawful and unfair actions by being deprived of statutorily mandated compensation for professional services.

54. Mr. Lopez has no recourse because he is barred from receiving compensation from his client.

## CLASS ACTION ALLEGATIONS

55. Plaintiff brings this action on behalf of Plaintiff and a Class and Subclass of all others similarly situated, defined as:

> **Class: All persons and entities in the United States who (1) served as an Agent[6] for a person or entity who applied for and received a PPP loans through Bank of America, N.A. and (2) were not paid an Agent Fee[7] by Bank of America, N.A.**

---

[6] "Agent" refers to the term "agent" as it is used in Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020), and the Paycheck Protection Program (PPP) Information Sheet for Lenders (Mar. 31, 2020), https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed June 24, 2020).

[7] "Agent Fee" refers to the agent fees described in Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01, 20816 (April 15, 2020).

**California subclass: All persons and entities in California who (1) served as an Agent for a person or entity who applied for and received a PPP loans through Bank of America, N.A. and (2) were not paid an Agent Fee by Bank of America, N.A.**

56. The class definition is subject to modification, including the addition of one or more subclasses, based on facts obtained in discovery.

57. Excluded from the classes are the Defendant; any entities in which it has a controlling interest; its agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

58. Plaintiff proposes that Plaintiff be appointed class representative.

59. Plaintiff and the Class have been harmed by Defendant's acts.

60. Numerosity is satisfied. Upon information and belief, there are thousands of class members. Individual joinder of these persons is impracticable.

61. There are questions of law and fact common to Plaintiff and the Classes, including, but not limited to:

   a. Whether Defendant's conduct violates the CARES Act or its implementing regulations;

   b. Whether Defendant is required to compensate Plaintiff from the origination fees it is entitled to receive or has received from SBA through the PPP;

   c. Whether Defendant's conduct was willful and knowing;

   d. Whether Defendant has a policy and/or practice of declining to pay Agents for their participation in the PPP;

   e. Whether Defendant's conduct was unlawful;

   f. Whether Defendant's conduct was unfair;

   g. Whether Plaintiff and the Class Members are third-party beneficiaries of Defendant's contract with the SBA;

   h. Whether Defendant was unjustly enriched;

   i. Whether Plaintiff and the Class members are entitled to restitution of funds unlawfully withheld;

   j. Whether Plaintiff and the Class Members are entitled to injunctive or declaratory relief; and

1            k.    Whether Plaintiff and the Class Members are entitled to damages.

2    62.    Plaintiff's claims are typical of the claims of Class Members. Plaintiff and the Class Members were all harmed when Defendant refused to pay them Agent Fees under the PPP. Plaintiff's claims are not antagonistic to the claims of other Class Members.

63.    Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class Members. Plaintiff will fairly and adequately protect the interests of the Class.

64.    Plaintiff has hired counsel that is skilled and experienced in class actions, including numerous complex class actions against financial institutions, and are adequate class counsel capable of protecting the interests of the Class Members.

65.    Common questions of law and fact predominate over questions affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication of this controversy. The damages suffered by individual Class Members are likely relatively small, and it would be difficult and not economical for individual Class Members to pursue complex litigation against Defendant to recover the fees to which they are entitled. Further, individual litigation would increase the delay and expense to all parties due to the complex legal and factual issues presented in the Complaint. A class action provides easier management, the benefits of single adjudication, and economies of scale.

**CAUSES OF ACTION**
**COUNT I**
**Declaratory Relief**
**28 U.S.C. § 2201**
**On behalf of Plaintiff and the Class**

66.    Plaintiff incorporates by reference paragraphs 1 through 65 set forth above.

67.    Plaintiff and the Class Members are "agents" as defined by the PPP Regulations and publications pertaining to the PPP.

68.    Plaintiff and the Class Members assisted clients with preparing applications for, and applying for, PPP loans, which were funded by Defendant through the PPP.

69.    The PPP Regulations provide that Plaintiff and the Class Members must be compensated for that work by Defendant, from the fees that Defendant received from the SBA as

compensation for its participation in the program.

70. Defendant has refused to make these payments.

71. An actual controversy has arisen between Plaintiff and the Class Members, on the one hand, and Defendant, on the other, because Defendant by its refusal to pay Agent Fees to Plaintiff and the Class Members denies that it is obligated to do so.

72. Plaintiff and the Class Members seek a declaration in accordance with PPP Regulations and the Declaratory Judgment Act that Defendant is obligated to set aside money to pay, and to pay, agents in accordance with PPP Regulations for work performed on behalf of a client in relation to the preparation and/or submission of a PPP loan application that resulted in a funded PPP loan.

**COUNT II**
**Unjust Enrichment**
**On behalf of Plaintiff and the Class**

73. Plaintiff incorporates by reference paragraphs 1 through 65 set forth above.

74. Defendant received a benefit in the form of origination fees paid by the SBA in connection with funded PPP loans.

75. Under the PPP Regulations and SBA guidance, a portion of those fees were to be paid to Agents, like and including Plaintiff and the Class Members, who assisted with their clients' successful PPP applications.

76. Defendant is refusing to pay those Agent Fees, in contravention of PPP Regulations.

77. Defendant is thus benefiting in the form of millions of dollars of origination fees, to the detriment of Agents including Plaintiff and the Class Members, by keeping the Agents Fees for itself.

78. It would be inequitable, unjust, and unfair to permit Defendant to retain the Agent Fees owed to Plaintiff and the Class Members under the PPP Regulations and SBA guidance. This is particularly so in the context of a global pandemic that has rattled the economy.

79. Defendant must disgorge the portion of any and all PPP origination fees that is owed to Plaintiff and the Class Members in their capacities as Agents.

///
///

**COUNT III**
**Conversion**
**On behalf of Plaintiff and the Class**

80. Plaintiff incorporates by reference paragraphs 1 through 65 set forth above.

81. Under the PPP Regulations and SBA guidance, Plaintiff and the Class Members, as Agents, have a right to Agent Fees that must be paid from the lender origination fees provided to Defendant by the SBA in exchange for processing the funded PPP loan applications of Plaintiff's and the Class Members' clients.

82. The PPP Regulations state that "Agent fees *will* be paid out of lender fees" and create specific guidelines for the amount that should be paid. The SBA determined that the Agent Fee limits are "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans."

83. The PPP Regulations also unequivocally state that Agents "may not collect fees from the applicant," making it clear that the lenders are responsible for paying the Agents Fees.

84. Plaintiff and the Class Members assisted their clients with applications for PPP loans that were subsequently funded. Due to Plaintiff's and the Class Members' efforts, their clients were awarded PPP loans through applications to Defendant. As such, Plaintiff and the Class Members have a right to immediate possession of Agent Fees to be paid by Defendant.

85. Although Plaintiff and the Class Members are entitled to Agent Fees under the PPP Regulations, Defendant has refused to provide those fees to Plaintiff and the Class Members, instead enacting a policy that it does not pay Agent Fees unless the Agent has a pre-existing relationship with Defendant.

86. By retaining the Agent Fees for itself, Defendant has maintained wrongful control over Plaintiff's and the Class Members' property, inconsistent with their entitlements under the PPP Regulations.

87. Each Agent Fee to which Plaintiff and the Class Members are entitled is a specific, identifiable sum, according to the amount of the PPP loan funded and the applicable PPP Regulation. Plaintiff, for example, is entitled to an Agent Fee of $702.43, which Defendant has wrongfully retained.

88. Plaintiff and the Class Members have been injured by Defendant's wrongful exercise

of dominion over their property.

**COUNT IV**
**Money Had and Received**
**On behalf of Plaintiff and the Class**

89. Plaintiff incorporates by reference paragraphs 1 through 65 set forth above.

90. Under the PPP Regulations and SBA guidance, Plaintiff and the Class Members, as Agents, have a right to Agent Fees that must be paid from the lender origination fees provided to Defendant by the SBA in exchange for processing the funded PPP loan applications of Plaintiff's and the Class Members' clients.

91. The PPP Regulations state that "Agent fees *will* be paid out of lender fees" and create specific guidelines for the amount that should be paid. The SBA determined that the Agent Fee limits are "reasonable based upon the application requirements and the fees that lenders receive for making PPP loans."

92. The PPP Regulations also unequivocally state that Agents "may not collect fees from the applicant," making it clear that the lenders are responsible for paying the Agents Fees.

93. Plaintiff and the Class Members assisted their clients with applications for PPP loans that were subsequently funded. Due to Plaintiff's and the Class Members' efforts, their clients were awarded PPP loans through applications to Defendant. As such, Plaintiff and the Class Members have a right to immediate possession of Agent Fees to be paid by Defendant.

94. Although Plaintiff and the Class Members are entitled to Agent Fees under the PPP Regulations, Defendant has refused to provide those fees to Plaintiff and the Class Members, instead enacting a policy that it does not pay Agent Fees.

95. Defendant received money that was intended to be used for the benefit of Plaintiff and the Class Members when it received origination fees, a portion of which were earmarked for Plaintiff and the Class Members as Agent Fees under the PPP Regulations.

96. Instead of paying that money to Plaintiff and the Class Members, Defendant kept that money for itself. Thus, the money was not used for Plaintiff's or the Class Members' benefit.

97. Defendant has not given the money to Plaintiff or the Class Members.

98. In equity and good conscience, the Agent Fees should be paid by Defendant to Plaintiff

and the Class Members.

**COUNT V**
**Breach of Contract – Third Party Beneficiary**
**On behalf of Plaintiff and the Class**

99. Plaintiff incorporates by reference paragraphs 1 through 65 set forth above.

100. Upon information and belief, in order to process PPP loan applications, Defendant entered into an agreement with the SBA.

101. The agreement required that Defendant adhere to the PPP Regulations and certify compliance with them under penalty of perjury. The agreement between the SBA and Defendant thus incorporates the PPP Regulations by reference.

102. As part of the agreement, Defendant certified, under penalty of perjury, that it was in compliance and would remain in compliance with PPP Regulations that specifically require PPP lenders to pay the fees of any Agent that assists with successful PPP applications, within limits.

103. Plaintiff and the Class Members were intended beneficiaries of the agreement between the SBA and Defendant. Thus, Plaintiff and the Class Members may enforce the promises directly made for them, including the promise to comply with PPP Regulations mandating lenders, including Defendant, to pay Agent Fees.

104. The acts of the SBA and Defendant created a duty and established privity between Defendant on the one hand, and Agents, including Plaintiff and the Class Members, on the other.

105. Nevertheless, Defendant has breached the agreement by violating the PPP Regulations when it adopted a policy stating that it would not pay Agents who did not have a pre-existing agreement with Defendant, and refused to pay Plaintiff and the Class Members the Agent Fees to which they are entitled.

106. By refusing to pay Agent Fees in accordance with PPP Regulations, Defendant is in violation of the terms of the agreement with the SBA, thereby damaging Plaintiff and the Class Members.

///

///

///

# COUNT VI
**Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200** *et seq.*
**On behalf of Plaintiff and the California Subclass**

107. Plaintiff incorporates by reference paragraphs 1 through 65 set forth above.

108. The California Unfair Competition Law ("UCL") defines unfair business competition to include any unlawful, unfair, or fraudulent act or practices. Cal. Bus. & Prof. Code § 17200.

109. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

110. As described in detail above, Defendant's conduct violates the PPP Regulations. The PPP Regulations provide that "Agent fees ***will be paid*** by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds." The PPP Regulations state the amount that Agents, including Plaintiff and the Class Members, may collect from Defendant.

111. Defendant enacted a companywide policy that it will not pay Agents fees unless the Agent had a pre-existing relationship with Defendant. Defendant has not paid Plaintiff or the Class Members the Agent Fees that Defendant was required to pay them under the PPP Regulations.

112. Defendant's policy and practice of not paying Agent Fees to Plaintiff and the Class Members is "unlawful" under the UCL because it violates the PPP Regulations.

113. As a result of Defendant's unlawful conduct, Plaintiff and the Class Members have suffered economic injury, and Defendant has been unjustly enriched. Defendant obtained fees that it was required to pay, but did not pay, to Plaintiff and the Class Members.

114. Plaintiff requests that the Court cause Defendant to restore the monies owed Plaintiff and the Class Members and enter an injunction requiring Defendant to implement policies for identifying Agents (as defined in the PPP Regulations and SBA guidance) and paying them the Agent Fees required to be paid under the PPP Regulations.

115. Plaintiff requests that the Court require Defendant to pay Plaintiff's reasonable attorneys' fees and costs of suit.

///

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully prays that this Court:

a. Enter an order certifying the Class, appointing Plaintiff as the Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b. Enter an order declaring that Defendant's actions and omissions, described above, are unlawful;

c. Award all actual, consequential, compensatory, punitive, and statutory damages as available under law, including without limitation actual damages for past, present, and future expenses caused by Defendant's misconduct, lost time and interest, and all other damages suffered;

d. Award restitution to Plaintiff and the Class Members;

e. Award pre- and post-judgment interest as allowed by law;

f. Award Plaintiff's reasonable attorneys' fees and expenses;

g. Enter such injunctive and declaratory relief as necessary to protect the interests of Plaintiff and the Class; and

h. Award such other and further relief as the Court deems reasonable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: June 24, 2020                Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　/s/ Hassan A. Zavareei
　　　　　　　　　　　　　　　　　　Hassan A. Zavareei (SBN 181547)
　　　　　　　　　　　　　　　　　　Andrea R. Gold*
　　　　　　　　　　　　　　　　　　Katherine M. Aizpuru*
　　　　　　　　　　　　　　　　　　TYCKO & ZAVAREEI LLP
　　　　　　　　　　　　　　　　　　1828 L Street NW, Suite 1000
　　　　　　　　　　　　　　　　　　Washington, D.C. 20036
　　　　　　　　　　　　　　　　　　Telephone: (202) 973-0900
　　　　　　　　　　　　　　　　　　Facsimile: (202) 973-0950
　　　　　　　　　　　　　　　　　　hzavareei@tzlegal.com
　　　　　　　　　　　　　　　　　　agold@tzlegal.com
　　　　　　　　　　　　　　　　　　kaizpuru@tzlegal.com

　　　　　　　　　　　　　　　　　　*Counsel for Plaintiff and the Putative Class*

　　　　　　　　　　　　　　　　　　*Pro hac vice applications to be submitted*